# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DIETRICH & ASSOCIATES, INC.,
*Plaintiff,*

v.

JOHN R. NEISON, et al.,
*Defendants.*

CIVIL ACTION
NO. 18-5034

**PAPPERT, J.**                                              **June 26, 2020**

## MEMORANDUM

Dietrich & Associates, Inc. sued John R. Neison, Jill K. Neison and Mark P. Unhoch alleging breaches of the restrictive covenants in their respective employment and consulting agreements, statutory trade secret violations, Computer Fraud and Abuse Act violations, unfair competition, tortious interference with business and prospective business relations, breach of fiduciary duty and unjust enrichment. (Compl., ECF No. 1.)  Defendants move for summary judgment on all claims.  (ECF No. 21.)  After hearing oral argument, reviewing the record and considering D&A's response (ECF No. 23), Defendants' reply (ECF No. 25), the parties' supplemental briefs (ECF Nos. 32 and 34) and their statements of undisputed material facts (ECF Nos. 31 and 35), the Court grants the motion only with respect to the unfair competition claims and denies it in all other respects.

I

A

D&A is a Pennsylvania-based "independent advisory firm . . . specializing in assisting pension plan fiduciaries with insuring retirement benefits."  (Pl's Statement of

Facts, ECF No. 35, ¶ 1.)  More specifically, the company "specializes in transferring pension plan obligations over to insurance companies" through transactions known as "pension risk transfers."  (Defs.' Statement of Facts, ECF No. 31, ¶ 4.)  D&A is based in Pennsylvania.  Non-party Kurt Dietrich is D&A's founder, President, Chief Executive Officer and 98% owner.  (Pl.'s Statement of Facts, ¶ 3.)  Geoffrey Dietrich is Kurt's nephew and D&A's Executive Vice President.  (*Id.* ¶ 5.)

John Neison is Kurt Dietrich's brother-in-law.  He worked for D&A in a sales role from his home in South Carolina from 1991 until January 15, 2018, when he was terminated.  (*Id.* ¶¶ 9-10, 13.)  Approximately eight years after Neison started working for D&A, he was asked to sign an employment agreement as a condition of his continuing employment.  (Defs.' Br., ECF No. 21, at 3.)  The agreement, executed on June 6, 1999, is the only employment agreement Nieson signed with D&A.  It included the following non-solicitation clause:

> From and after the date hereof, and for a two (2) year period following the termination of your employment with the Company for any reason whatsoever (including your resignation from employment), except in connection with your employment duties and responsibilities hereunder, you shall not, either directly or indirectly, in any capacity whatsoever, solicit from, or sell to, or divert business from, or act as a consultant to, any customer or account of the Company (or any potential customer or account of the Company) of which you are or shall become aware or with which you have had personal contact as a result of, or in connection with, through your employment with, or through your affiliation with, the Company, whether or not pursuant to this letter and whether or not prior to or after the date hereof.

(Defs.' Mot., Ex. 5, ¶ 14.)

Jill Neison is John's daughter and Kurt Dietrich's niece.  (Pl's Statement of Facts at ¶ 15.)  She began work for D&A in a sales role from her home in Georgia in or around August 2012 and resigned on January 5, 2018.  (*Id.* ¶ 16.)  On August 25, 2012,

she signed an employment agreement including a non-solicitation provision which tracks the language used in John Nieson's employment agreement, except for one absent line of text.  Instead of barring solicitation from any "customer or account of the Company . . . of which you are or shall become aware or with which you have had personal contact as a result of, or in connection with, through your employment with or through your affiliation with the Company" (Def.'s Mot. Ex. 5, ¶ 14), Jill Nieson's agreement bars her from soliciting "any customer or account of the Company" with which she had "personal contact as a result of" her "employment with, *the phrase 'in any capacity' . . . .*" ((Defs.' Mot., Ex. 4, ¶ 14 (emphasis added).)  Said otherwise, after the phrase "through your affiliation with," her agreement excludes the words "the Company, whether or not pursuant to this letter and whether or not prior to or after the date hereof." (Def.'s Mot. Ex. 5, ¶ 14.)  D&A contends the omitted words are the result of a drafter's error and the language in John Neison's agreement was used in all employment agreements for employees hired prior to Jill.  (Pl.'s Resp., ECF No. 23, Geoffrey Dietrich Decl., ¶ 49.)

D&A hired Mark Unhoch (who is not related to any D&A employee) to work as a consultant in or around September 2006 and he worked for the company from his home in Connecticut until December 31, 2017.  (Pl.'s Statement of Facts, ¶ 20.)  On September 15, 2006, Unhoch signed a consulting agreement with D&A on behalf of EBL Consulting, LLC.  (Defs.' Mot., Ex. 6.)  Unhoch is EBL Consulting's founder, sole owner and only employee.  (Pl.'s Resp., Ex. 17, Operating Agreement of EBL Consulting LLC at Ex. B; *see also* Pl.'s Resp., Ex. 2, Unhoch Dep. At 59:21-24.)  EBL filed its Articles of Organization with the State of Connecticut on October 11, 2006, after Unhoch signed

the consulting agreement with D&A.  (Pl.'s Resp., Ex. 17.)  Kurt Dietrich testified he did not hire Unhoch as a W2 employee because, at the time, the Attorney General of Connecticut was investigating D&A and others in the annuity brokerage industry. (Kurt Decl. ¶¶ 26-28; Kurt Dep. 137:2-20.)  The agreement Unhoch signed with D&A on EBL's behalf included a non-solicitation provision identical to that in John Neison's employment agreement, except that "consulting arrangement" is substituted for employment.  (Defs.' Mot., Ex. 6, ¶ 12.)  Through EBL, Unhoch managed and maintained existing client, referral and insurance company relationships, underwriting business opportunities for D&A.  He also managed the annuity placement process.

In addition to the non-solicitation provisions, Defendants' agreements also included non-interference and non-disclosure restrictions.  In relevant part, the non-interference provisions state:

> At any and all times from and after the date hereof, and for a two (2) year period following the termination of your [employment/consulting arrangement] with the Company for any reason whatsoever, you shall not . . . (b) directly or indirectly interfere with the Company's relations with any person employed by it.

(Defs.' Mot., Ex. 4, ¶ 13; Ex. 5, ¶ 13; Ex. 6, ¶ 10.)

The non-disclosure provisions provide that, for a two-year period following the termination of their respective employment or consulting arrangement, each should not:

> make any use of, exploit, disclose, copy, remove from the Company's business premises or divulge to any other person, firm or corporation, any trade or business secret, customer or supplier information, documents, know-how, data, marketing information, methods or means, software, reports, special insurance company arrangements, or any other confidential (i.e., not already otherwise disseminated to or available to the public) information concerning the business or policies of the Company, that you learned as a result of, in connection with, through your employment with,

4

or through your affiliation with the Company, whether or not pursuant to
this letter, and whether or not prior to or after the date hereof.

(Defs.' Mot., Ex. 4, ¶ 12; Ex. 5, ¶ 12; Ex. 6, ¶ 10.)

B

October Three Consulting LLC provides actuarial and administration services
for defined benefit pension plans.  (Defs.' Statement of Facts, ¶ 25.)  It was founded in
2009 by its current President and CEO Jeff Stevenson.  (*Id.* ¶ 26.)  October Three
placed annuities on a limited basis (*Id.* ¶ 69) but was not D&A's direct competitor.
(Pl.'s Statement of Facts, at ¶ 29.)  It referred various actuarial services clients to D&A
for annuity placements.  (*Id.* ¶ 169.)  Eventually it determined "the pension risk
transfer business might be 'a good business to get into' in a more comprehensive
manner."  (Defs.' Statement of Facts ¶ 69.)

In August 2017, Unhoch met with October Three personnel in Chicago to discuss
work D&A was doing for the company.  (Pl.'s Statement of Facts ¶¶ 175-176; Defs.'
Statement of Facts ¶¶ 74-78.)  After the meeting, October Three employee Ray Aguilera
spoke to Unhoch on the phone and told him Stevenson would like to meet with Unhoch
to discuss possible employment opportunities.  (Defs.' Statement of Facts ¶¶ 79-80.)
Unhoch went back to Chicago on August 28, 2017 and met with Stevenson, Aguilera
and Brian Donohue, an October Three partner.  (*Id.* ¶¶ 81-82.)  After the meeting,
Unhoch told John Neison he was discussing a potential job with October Three.  (Pl.'s
Statement of Facts ¶ 185.)  On September 19, 2017, Neison emailed Stevenson from his
personal account "without [Unhoch's] knowledge, to offer [his] unsolicited opinion and
recommendation" and "urge [Stevenson] to hire [Unhoch]."  (*Id.* ¶ 186.)  In the email,
John Neison expressed "concern[ ] about Dietrich's future" and noted he "fores[aw] the

5

conclusion of [his own] career with Dietrich to be imminent." (*Id.*)  After he sent the email, John forwarded it to Unhoch and his niece Jill.  (*Id.* ¶ 187.)  After receiving Neison's email, Stevenson called him to discuss Unhoch's "character."  (*Id.* ¶ 188.)  On October 16, 2017, Unhoch emailed Stevenson from his personal account and proposed that October Three hire him to enter the pension risk transfer market, in competition with D&A.  (*Id.* ¶ 189.)  Stevenson and Unhoch later spoke on the phone and discussed other D&A employees who supported Unhoch, including John and Jill Neison.  (*Id.* ¶¶ 190-91.)

On November 21, 2017, Stevenson called Jill Neison to discuss a potential job and made plans for her to visit October Three's headquarters the following week.  (*Id.* ¶¶ 192, 197.)  She met with Stevenson at October Three in Chicago on November 27, 2017 and discussed starting an annuity services practice.  (*Id.* ¶ 199.)  On November 29, 2017, Stevenson emailed Unhoch an offer letter.  Unhoch accepted the job the following day and then notified D&A he had accepted employment elsewhere.  (*Id.* ¶¶ 201-202; Defs.' Statement of Facts ¶ 86.)  Around the same time, Jill Neison received her offer letter from Stevenson.  (Pl.'s Statement of Facts ¶ 207.)  She accepted a position with October Three in early December 2017.  (*Id.* ¶ 209.)  Unhoch left D&A on or around December 29, 2017.  (Defs.' Statement of Facts ¶ 87.)  Jill Neison resigned from D&A on January 5 or January 19, 2018.  (*Id.* ¶ 102; Pl.'s Statement of Facts ¶ 214.)

On December 12, 2017, shortly after Unhoch and Jill Neison agreed to work for October Three, Stevenson established O3 Annuity Services LLC as a wholly owned subsidiary to broker annuities and compete with D&A.  (Pl.'s Statement of Facts ¶¶ 30, 210.)  In or around January 2018, he contacted John Neison regarding a potential job

opportunity.  (Defs.' Statement of Facts ¶ 103.)  D&A terminated John on January 15, 2018.  (*Id.* ¶ 104.)  Stevenson offered John Neison a job the next day.  (*Id.* ¶ 105.)  Neison "immediately" accepted it and began work for O3 on February 1, 2018.  (*Id.* ¶¶ 107, 109.)

After Unhoch and Jill Neison resigned, they retained documents D&A developed for its use during the annuity placement process.  (Pl.'s Statement of Facts ¶¶ 335, 337; *see also* PL.'s Resp. at 37-39 (listing D&A's purported confidential and proprietary documents.)  D&A stores the documents on password-protected computer servers and in its password-protected electronic customer management database.  (Pl.'s Statement of Facts ¶ 338.)

After joining O3, Unhoch emailed himself, from his personal account to his O3 email address, a Confidentiality Agreement, Statement of Work and 45-Day Notice. The message bore the subject line "Sample documents."  (*Id.* ¶¶ 340-41.)  The Confidentiality Agreement and Statement of Work were identical to D&A templates, although D&A's name was replaced with the words "O3 Annuity Se[r]vices LLC."  (*Id.* ¶ 343.)  Unhoch contends he did this because he "wanted to make sure the O3 Annuity documents didn't look anything like these," but could not explain why the documents included the words "O3 Annuity Services."  (*Id.* ¶¶ 344-45.)

Before Jill Neison left D&A, she periodically transferred D&A files onto flash drives to keep backups or to do work.  (Defs.' Statement of Facts ¶¶ 157-58.)  D&A distributes its Best Practices Guide and Methodology at conferences.  (Defs.' Statement of Facts. ¶ 154.)  D&A sends the "Statement of Work" in response to a request for a proposal and before D&A begins any work on an annuity placement.  (*Id.* ¶ 153.)  The

final bid process is similar for all brokers in the industry.  (*Id.* ¶ 155.)  When she

resigned, Neison retained marketing materials D&A disseminated to the public during

conferences.  (*Id.* ¶ 161.)  After she joined O3, she emailed D&A's Best Practices

Guidelines, Best Practices Methodology and Final Bid Process to October Three's

Director of Marketing.  (Pl.'s Statement of Facts ¶ 347.)  She then discussed the

documents with Unhoch and the marketing director on the phone.  (*Id.* ¶ 348.)

Once at O3, Defendants sought to identify and develop business relationships

with plan sponsors who they considered not to be D&A customers.  (*Id.* ¶ 110.)  They

used some "referral sources" with whom they worked while D&A employed them, but

believed they were not violating their non-solicitation provisions because, in their

opinion, "referral *sources*" were not accounts or customers.[1]  (*Id.* ¶¶ 113-115 (emphasis

added).)  They searched the internet for phone numbers and email addresses of D&A's

referral clients – actuaries and other trusted advisors – who were their primary source

of business while at D&A.  (Pl.'s Statement of Facts ¶ 243.)  Defendants concede "some

of the referral sources [they] used to identify and develop business relationships with

plan sponsors . . . were referral sources with whom Defendants had worked . . . while

employed by Dietrich."  (Defs.' Statement of Facts ¶ 113.)

C

D&A contends Defendants "have solicited a total of more than 220 of D&A's

referral *clients*" to date.  (Pl.'s Statement of Facts ¶ 247 (emphasis added).)  It claims

---

[1]      Instead of using the terms "customer" or "account," Defendants use the term "referral
sources," while D&A uses the term "referral clients."  Given the parties' conflicting terminology, the
Court will refer to these individuals or entities as "referral sources/clients" when not using quoted
language.

Defendants' actions have resulted in at least thirty-two annuity placements being diverted from D&A to October Three, including eight placements Defendants were working on for D&A at the time of their departure. (*Id.* ¶ 255; *see also* Pl.'s Resp., Ex. 43 at 5-6 and App'x 3 and 4.) For at least one placement, for plan sponsor Hytrol Conveyor Company, Inc., Stevenson acknowledged he took no steps to make sure Unhoch and Jill or John Neison did not work on O3's proposal. (Pl.'s Statement of Facts ¶ 273.) Hytrol received a proposal for a single premium group annuity with preliminary pricing and premium amounts from D&A in February 2017. (*Id.* ¶¶ 259-260.) During the negotiation process, Hytrol agreed to keep D&A's pricing and commission confidential. (*Id.* ¶ 261.) Hytrol then postponed the transaction in Fall 2017. (*Id.* ¶ 262.) Hytrol's actuary, and one of D&A's referral sources/clients, contacted John Neison in August 2018 about Hytrol's postponed transaction. (*Id.* ¶¶ 256-57, 266-67.) Unhoch recognized Hytrol was "a Dietrich client" and contacted Stevenson, asking if it would be appropriate to proceed by having O3 employees who were not former D&A employees do the work in place of Unhoch and John Neison. (*Id.* ¶ 269.) Stevenson instructed Unhoch to have the other O3 employees "put our bid in" and "run with it." (*Id.* ¶ 271.)

D&A also claims Defendants interfered with another in-progress annuity placement after they left for O3. Before leaving D&A, Jill Neison had been working on annuity placements with Greg Gaston, an actuary. (*Id.* ¶¶ 278-282.) One of those placements was for plan sponsor MiniFibers, Inc. (*Id.* ¶ 280.) On October 26, 2017, MiniFibers signed a Confidentiality Agreement designating D&A as its "broker of record for soliciting, obtaining and providing Single Premium Group Annunity quotes."

(*Id.* ¶ 281.)  After joining O3, Jill Neison and the other Defendants solicited Gaston.

(*Id.* ¶¶ 283-84.)  Gaston emailed Neison on August 2, 2018 and asked if she could

continue working on a placement for MiniFibers.  (*Id.* ¶ 285.)  Defendants spoke with

Gaston and MiniFibers on August 3, 2018 about the possible implications of

Defendants' contracts with D&A.  (*Id.* ¶ 287.)  After the discussion, MiniFibers agreed

to send O3 a letter stating it no longer wished to work with D&A.  (*Id.* ¶¶ 289-90.)

MiniFibers signed O3's statement of work the same day as its letter, in which it said it

had

> decided to no longer work with [D&A] now and moving forward . . . because
> we are dissatisfied with the service we have received over the last several
> months.   We requested our plan actuary, Greg Gaston, to provide
> information on additional companies we could work with on our plan
> termination.  We then requested Greg to contact O3 Annuity Services LLC
> on our behalf.

(Defs.' Mot., Ex. 23; *see also* Pl.'s Statement of Facts ¶ 290.)  Defendants characterize

MiniFibers as a "boomerang customer" – one of several "companies they considered

customers of [D&A]" who they turned away "only for the customer to come back to [O3]

(like a boomerang) claiming they did not want to work with Dietrich and wanted to

work with [O3]."  (Defs.' Br. at 11.)

II

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The

movant bears the initial responsibility for informing the Court of the basis for its

motion and identifying those portions of the record which it believes demonstrate the

absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*,

364 F.3d 135, 145 (3d Cir. 2004), holding modified by *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it may affect the suit's outcome under the governing law. *Id.* at 248. A mere scintilla of evidence supporting the nonmoving party, however, will not suffice. *Id.* at 252. Rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Id. at 256.

When ruling on a motion for summary judgment, the court may rely only on admissible evidence. *See* Fed. R. Civ. P. 56(c); *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 94 (3d Cir. 1999). A court must view the facts and draw all reasonable inferences in the nonmoving party's favor. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004). But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). Nor may a court make credibility determinations or weigh the evidence. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

### III

### A

Each Defendant incorrectly contends summary judgment should be granted in their favor on D&A's breach of contract claims because they believe the contracts are unenforceable as a matter of law.

### 1

John Neison claims he is not bound by his employment agreement because D&A

"materially breached [his] contract by failing to provide his insurance premiums as promised . . . ."  (Defs.' Br., ECF 21, at 20.)  First of all, any question as to whether D&A materially breached the contract by requiring Neison to contribute to his health insurance premiums is for the jury. *See Sands v. Wagner*, No. 01-1475, 2006 WL 1094555, at *3 (M.D. Pa. April 25, 2006) ("[T]he question whether there has been a material breach [under Pennsylvania law] is ordinarily for the jury."); *Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1272 (Pa. Super. Ct. 2012) ("[W]e and other courts consistently have treated inquiries into the materiality of a given breach as fact questions rather than questions of law to be decided from the bench.").

Second, "a party cannot continue to perform under the contract and later be heard to say that the other party breached the agreement prior to the continued performance, and therefore, no contract existed." *Fuller Co. v. Brown Minneapolis Tank & Fabricating Co.*, 678 F. Supp. 506, 509 (E.D. Pa. 1987).  John Neison acknowledges that, prior to this lawsuit, he never claimed that D&A breached his employment agreement when it required him to pay a portion of his health insurance premiums.  (*See* Transcript June 2, 2020 Argument, ECF 28, at 41:5-9; *see also* Pl's Ex. 14 ("New Benefit Announcement" addressed to "All Full Time Employees" of D&A outlining "new employee contributions" of $20 per month for the medical plan as of November 1, 2004). There is no record evidence showing Neison failed to pay or objected to the employee contributions after they were first required in November 2004.  "By electing to continue [his] performance" after he was asked to pay for a portion of his health benefits, Neison "remains bound by the terms of the contract." *Fuller Co.*, 678 F.

Supp. at 509; *see also Muchow v. Schaffner*, 119 A.2d 568, 570 (Pa. Super. Ct. 1956)

(agreement to modify may be inferred from actions of parties to the contract); *cf. Nat'l*

*Auto Brokers Corp. v. Aleeda Dev. Corp.*, 364 A.2d 470 (Pa. Super. Ct. 1976)

("Ratification results if a party who executed a contract under duress accepts the

benefits flowing from it, or remains silent, or acquiesces in the contract for any

considerable length of time after the party has the opportunity to annul or avoid the

contract.").

2

For her part, Jill Neison argues that the non-solicitation provision in her

employment agreement is not enforceable because it is "nonsensical."  (Defs.' Br. at 21-

22.)  As written, it says she "shall not solicit . . . any customer or account of the

Company . . . of which you are or shall become aware . . . . through your employment

with . . . *the phrase 'in any capacity'* . . . ."  (Defs.' Mot. Ex. 4, ¶ 14 (emphasis added).)

Defendants argue that, "[a]s drafted, the provision fails to meaningfully explain to Ms.

Neison what her obligations are and who she can and cannot solicit."  (Defs.' Br. at 22.)

They claim the provision is ambiguous at best "and must, therefore be construed

against [D&A]."  (*Id.*)

The other Defendants' non-solicitation provisions clearly bar them from soliciting

customers or accounts "of which you are or shall become aware or with which you have

had personal contact as a result of, or in connection with, *through your employment*

*with, or through your affiliation with, [D&A]. . . .*"  (*See* Defs.' Ex. 5, ¶ 14 (emphasis

added); Defs.' Ex. 6, ¶ 12 (emphasis added).)  D&A contends the discrepancy between

the clause in these agreements and that in Jill Neison's "was an inadvertent

typographical error of the drafter." (Pl.'s Resp. at 57.) It asserts the Court may correct the "inadvertent omission" and "reform[ ]" Neison's non-solicitation provision "to match John's and Mark's." [2] (*Id.*) In the alternative, D&A argues if the omitted words render Jill Neison's non-solicitation provision ambiguous, its meaning is an issue of fact to resolve at trial. (*Id.*)

Whether a contract is ambiguous is a question of law. *See St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir.1991) (applying Pennsylvania law). "A patent ambiguity appears on the face of the contract occurs when the language used is defective, obscure, or insensible." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613–14 (3d Cir. 1995) (citing *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994)). Jill Neison's non-solicitation provision is patently ambiguous because it is "insensible," and interpreting it is a task for the jury. *See Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir.1994) (applying Pennsylvania law); *see also Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 233 (3d Cir. 2001) ("If the contract terms are ambiguous *or incomplete*, and extrinsic evidence is examined, interpretation of the contract becomes a question of fact, unless the extrinsic evidence is conclusive." (emphasis added).)

---

[2]     To the extent D&A asks the Court to so reform Jill Neison's contract (Pl.'s Br., ECF No. 23, at 56-57), the Court will not do so now. "The traditional reformation remedy in Pennsylvania is employed only to make the written contract document correspond to the understanding of the parties." *Murray v. Willistown Twp.*, 169 A.3d 84, 94 (Pa. Super. Ct. 2017) (citations and internal quotations omitted); *see also Com., Dep't of Gen. Servs. v. Lhormer Real Estate Agency, Inc.*, 549 A.2d 1008, 1010 (Pa. Commw. Ct. 1988) ("Reformation of a contract can only take place where there are contractual misapprehensions common to both parties."). Whether Jill Neison and D&A each understood the non-solicitation provision in her contract to mean the same thing as the other Defendants' non-solicitation provisions is for the jurors to decide.

3

Finally, Unhoch contends, without any legal support, that he is not personally bound by the terms of the consulting agreement between D&A and EBL.  (Defs.' Br. at 21.)  Given that Unhoch is EBL's sole member and that no one else could be bound by the consulting agreement's terms, his argument is based on a distinction without a difference.  Indeed, when Unhoch applied to work for October Three, he sent Stevenson a copy of his consulting agreement, but referred to it as "my employment agreement." (*See* Pl.'s Resp., Ex. 25.)  Also, when he left D&A in 2017, he emailed Geoffrey Dietrich suggesting he had been planning to "file for misclassification" of his employment with D&A, because he should have been classified as an employee and not as an independent contractor.  (Pl.'s Resp., Ex. 18.)

Under the Connecticut Uniform Limited Liability Company Act, "a limited liability company is an entity distinct from its member or members."  Conn. Gen. Stat. Ann. § 34-243g (West).  When Unhoch signed the consulting agreement with D&A, however, EBL had not yet filed its Articles of Organization.  (*See* Defs.' Mot., Ex. 6 and Pl.'s Resp., Ex. 17; *see also* Conn. Gen. Stat. Ann. § 34-247f (specifying the effective date and time for an LLC's certificate of organization).)  Under the circumstances, the contract between EBL and D&A is enforceable against Unhoch.  *See BRJM, LLC v. Output Sys., Inc., 917 A.2d 605, 612* (Conn. App. Ct. 2007) ("[C]ontracts entered into by individuals acting on behalf of unformed entities are enforceable."); *see also* Restatement (Third) of Agency § 6.04 (2006) ("[A] person who makes a contract with a third party purportedly as an agent on behalf of a principal becomes a party to the contract if the purported agent knows or has reason to know that the purported

principal does not exist or lacks capacity to be a party to a contract.").

B

D&A claims Defendants breached the non-solicitation provisions in their contracts in two ways:  (1) by doing business with so-called boomerang customers; and (2) by soliciting referral sources/clients.  Defendants argue summary judgment is warranted in their favor because they were free to work with boomerang customers and because referral sources/clients are not D&A's "customers or accounts" within the meaning of the non-solicitation provisions in their agreements.  (Defs." Br. at 13-17 and 22-23.)  They are incorrect on both counts.

1

Whether any business was a boomerang client and not covered by the non-solicitation provisions' restrictions is a jury question.  Defendants conceded as much at oral argument.  (*See* Tr. June 2, 2020 Oral Arg., ECF No. 28, at 30:3-14.)  Even absent that concession, numerous disputed issues of material fact preclude summary judgment.  For example, Defendants contend they "were free to do business with MiniFibers" because they first told Gaston – the referral source/client – that O3 could not work on a placement because MiniFibers was D&A's customer and then O3 did work for MiniFibers only after receiving its letter stating it had "decided to no longer work with [D&A] now and moving forward . . . ."  (Defs.' Br. at 11.)  D&A argues, however, that Jill Neison breached her non-solicitation provision by requesting MiniFibers provide the letter in question.  (Pl.'s Resp. at 35.)  It also claims Defendants' work with MiniFibers or other boomerang customers violated the non-solicitation provisions regardless of whether the companies were directly solicited because the

16

provisions bar Defendants from "directly or *indirectly*" soliciting, selling to, or diverting business from D&A customers or accounts.  (Defs.' Mot. Ex. 4, ¶ 14; Ex. 5 ¶ 14; Ex. 6 ¶ 12 (emphasis added).)  Jurors evaluating the evidence and assessing the credibility of the witnesses' explanations can decide just whose idea it really was for MiniFibers to leave D&A for O3 and whether any of the Defendants breached their contracts with D&A when MiniFibers did so.

2

Whether referral sources/clients are D&A's "customers" or "accounts" within the scope of Defendants' non-solicitation provisions is also a question for the jury. Defendants describe a "referral source" as a "'trusted advisor' to the plan sponsor, such as an actuary, ERISA attorney, investment advisor, or accountant." (Defs.' Br. at 9.) They explain brokers like D&A "do not receive payment from referral sources," and D&A "does not have exclusivity arrangements with" them. (*Id.* at 10.)  They argue "referral sources simply do not fit within the plain meaning of 'customer or account'" given that they "are retained by the customer, not by the broker." (*Id.* at 15.)  D&A counters that Defendants' argument "does not comport with the reality of how an annuity brokerage works" where "referral clients are the broker's primary means of obtaining business." (Pl.'s Resp. at 48.)  It contends "the non-solicitation provisions have no bite at all" if the term "customer" does not include referral clients and "should not be interpreted in a way that renders them meaningless." (*Id.*)

Pennsylvania law disfavors restrictive covenants and contracts containing them are subjected to "more rigorous scrutiny." (Defs.' Reply, ECF No. 25, at 3, citing *Socko v. Mid-Atlantic Sys. of CPA, Inc.*, 126 A.3d 1266, 1278 (Pa. 2015).)  Defendants contend

17

the non-solicitation provisions should be strictly construed in their favor to give the

terms "customer or account" their common meaning as "one that purchases a

commodity or service," i.e., not referral sources/clients.  (Defs.' Br. at 17.)  They are

correct that, in Pennsylvania, "any ambiguous language in a contract is construed

against the drafter and in favor of the other party," but this is only the case where "the

latter's interpretation is reasonable."  *Colorcon, Inc. v. Lewis,* 792 F. Supp. 2d 788, 798

E.D. Pa. 2011).  Given the record's portrayal of the nature of transactions in the

annuity brokerage industry, Defendants have not shown their interpretation of the

terms "customer or account" is reasonable – or even enforceable – as a matter of law.

"[A] determination whether the language of an agreement is unambiguous may not be

possible without examining the context in which the agreement arose."  *Hullett v.*

*Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994) (citing *Steuart v.*

*McChesney*, 444 A.2d 659, 662 (Pa. 1982)).  On the record before the Court, whether

Defendants' interpretation of customer or account as excluding referral sources/clients

is reasonable is a matter for the jury.  *See Hullett*, 38 F.3d at 111 ("If the contract is

determined to be ambiguous, then the interpretation of the contract is left to the

factfinder, to resolve the ambiguity in light of extrinsic evidence.").[3]

---

[3]      Defendants' additional argument that the non-solicitation provisions are unreasonable and
unenforceable as a matter of law because they "limit the options of various professionals to
recommend what they might consider the best course of action for their clients" requiring an annuity
placement also fails.  (Defs.' Br. at 18.)  Because Defendants challenge their contracts' validity, they
"bear[ ] the burden of proving that the terms. . . are unreasonable."  *Fisher Bioservices, Inc. v.*
*Bilcare, Inc.*, No. 06-567, 2006 WL 1517382, at *10 (E.D. Pa. May 31, 2006).  "The determination of
reasonableness is a factual one, requiring consideration of all the facts and circumstances . . . ."
*WellSpan Health v. Bayliss*, 869 A.2d 990, 999 (Pa. Super. Ct. 2005) (finding "the referral bases of a
specialized medical care institution" were a "protected interest [that] fit squarely within
Pennsylvania . . . law" governing restrictive covenants).

C

D&A asserts that John Neison breached the non-interference provision in his contract by recommending that October Three hire Unhoch and Jill Nieson – thereby "interfering with [D&A's] relations with any person employed by it." (Defs.' Ex. 5, ¶ 13; *see* Compl. ¶ 196.)  Defendants state John Neison "was merely taking part in the normal hiring process" by recommending Unhoch and Jill Neison to October Three. (Defs.' Br. at 24.)  D&A points to Nieson's email to Stevenson providing an "unsolicited opinion and recommendation" for Unhoch and reporting his advice to Jill Neison that she "reach out to" October Three "concerning employment opportunity."  (Pl.'s Br. at 55, *citing* Pl.'s Br. Ex. 11.)  Whether Neison's actions were interference with D&A's relations with its employees or just normal participation in the hiring process is for the jury to figure out.[4]

D

To recover under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.,* D&A must show that Defendants misappropriated its trade secrets:  information that:  (1) "the owner has taken reasonable means to keep secret"; (2) "derives independent economic value actual or potential from being kept secret;" (3) "is not readily ascertainable by proper means," and (4) "others who cannot readily access it would obtain economic value from disclosure or use."  *Teva Pharm. U.S.A., Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018).  Misappropriation is "the acquisition

---

[4]      D&A also claims Unhoch and Jill Neison breached their non-interference provisions. (Compl. ¶¶ 202-06; ¶¶ 209-13.)  Defendants argue "[i]t is unclear how this could be the case . . . because Unhoch and Jill . . . did not contact anyone regarding [D&A's] employees."  (Defs.' Br. at 24.) D&A does not respond to this argument nor point to any record evidence to support its allegations.

of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;" or the "disclosure or use" of a trade secret without the owner's consent.  18 U.S.C. § 1839(5)(A)-(B).  Information is obtained improperly if obtained through "breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means."  18 U.S.C. § 1839(6)(A).

The Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S.A. § 5301 *et seq.*, "protects against the misappropriation of trade secrets and the unjust enrichment caused by such misappropriation."  *Synthes, Inc. v. Emerge Medical, Inc.*, 25 F. Supp. 3d 617, 705 (E.D. Pa. 2014).  The statute prohibits the

> disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

12 Pa. C.S. § 5302.

Defendants contend they "have not taken anything that would constitute a trade secret of [D&A]." (Defs.' Br. at 27.)  Even if they had, they argue they "did not engage in any misappropriation of information." (*Id.*)  D&A responds that the "Due Diligence Report, Meeting Minutes and Proposal all contain information, analyses, and conclusions that are proprietary and trade secrets to D&A." (Pl.'s Mem. at 72.)

Whether any documents or information Jill Neison or Unhoch retained after leaving D&A constitute trade secrets requires resolving disputed fact questions: "The question of whether certain information constitutes a trade secret ordinarily is 'best resolved by a fact finder" after a full evidentiary presentation from each side. *Synygy, Inc. v. ZS Assocs., Inc.*, No. 07-3536, 2015 WL 899408, at *9 (E.D. Pa. Mar. 3, 2015)

(quoting *DSMC, Inc. v. Convera Corp.*, No. 479 F. Supp. 2d 68, 79 (D.D.C. 2007)). [5]

E

D&A also asserts a claim under the Computer Fraud and Abuse Act ("CFAA") 18 U.S.C. § 1030, which imposes civil liability on anyone who knowingly "accesses a protected computer without authorization, or exceeds authorized access" of a protected computer.  18 U.S.C. § 1030(a)(4).  To recover, D&A must show that it suffered aggregate damages of at least $5,000 during a one-year period.  18 U.S.C. § 1030(c)(4)(A)(i)(I).  Defendants argue D&A has not met its burden to show they accessed protected documents on D&A's servers or that it incurred the requisite damages.  (Defs.' Mot. at 29.)  However, they concede that Unhoch and Jill Nieson accessed at least some D&A documents.  Whether they did so on "a protected computer" and/or "without authorization," in excess of their authorized access, and caused the requisite damages is a question for trial.

F

D&A also asserts tort claims under Pennsylvania law against all Defendants for unfair competition (Count V), tortious interference with business relations and prospective business relations (Counts VIII and IX) and, against John Neison only, breach of fiduciary duty (Count IV).  Because D&A's contract claims survive summary judgment, the Court must first consider whether any of its tort claims are barred by Pennsylvania's gist of the action doctrine, which is designed "to maintain the

---

[5]      Defendants contend the gist of the action doctrine bars D&A's misappropriation of trade secrets claims.  (Defs.' Supplemental Br., ECF 32, at 7-9.)  But the doctrine does not bar the statutory trade secrets claims, which "can be pursued concurrently with a breach of contract claim covering the same information."  *Pittsburgh Logistics Sys., Inc. v. LaserShip, Inc.*, No. 18-CV-1382, 2019 WL 2443035, at *9 (W.D. Pa. June 12, 2019).

conceptual distinction between breach of contract claims and tort claims." *E Toll, Inc.*
*v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  "'[T]he important
difference between contract and tort actions is that the latter lie from the breach of
duties imposed as a matter of social policy while the former lie for the breach of duties
imposed by mutual consensus.'" *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247
F.3d 79, 103 (3d Cir. 2001) (quoting *Redevelopment Auth. of Cambria County v.*
*International Ins. Co.*, 685 A.2d 581, 590 (Pa. 1996)).  The gist of the action doctrine
bars tort claims against contracting parties where the claim "is, in actuality, a claim
against the party for breach of its contractual obligations." *Bruno v. Erie Ins. Co.*, 106
A.3d 48, 53 (Pa. 2014).  Only where the gist of the action doctrine does not prevent a
claim from proceeding to trial, will the Court consider the merits of Defendants' other
arguments in favor of summary judgment.

### 1

D&A concedes its unfair competition claims overlap with its contract claims
based on a breach of the non-disclosure provisions of Defendants' agreements.  It
"acknowledges that it has not pled any additional facts relevant to unfair competition
other than those pled with respect to the Contract Claims."  Because the contract
claims survive Defendants' motion for summary judgment, the unfair competition
claims are duplicative and the Court will dismiss them.

### 2

For D&A "[t]o recover on a tortious intentional interference with existing or
prospective contractual relationships claim in Pennsylvania," it "must prove that
[Defendants were] not privileged or justified in interfering with its contracts . . . ."

*Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 214 (3d Cir. 2009).

Defendants argue the non-solicitation provisions in their agreements prohibit the same

activity which forms the basis of their alleged tortious interference and that the gist of

the action doctrine bars the tortious interference claims.  (Defs.' Supplemental Br. at 6-

7.)  "A tortious interference claim is barred by the gist of the action doctrine if it is not

independent of a contract claim that it pled along with it."  *DePuy Synthes Sales, Inc. v.*

*Globus Med., Inc.*, 259 F. Supp. 3d 225, 243 (E.D. Pa. 2017) *(citation omitted).*

   D&A counters that its tortious interference claims encompass wrongful actions

not limited to Defendants' breaches of their contractual obligations.  As an example, it

cites John Neison's testimony that, after joining O3, he told potential referral

sources/clients to google D&A and "Department of Labor" because he thought that, if

they did so, they might be more likely to choose to do business with O3 instead of with

D&A.  (Pl.'s Supplemental Br. at 8-9 (citing John Tr., Pl.'s Resp., Ex. 5, at 235-16-

241:18.)  D&A argues "the added element of disparagement is at the heart of the

tortious interference claim and renders such claims distinct from the Contract Claims."

(Pl.'s Supplemental Br. at 9.)

   Material factual issues remain with respect to whether any Defendant possessed

the requisite intent necessary for D&A to prevail on its tortious interference claims.

*See Our Billing Dep't, Inc. v. TPS II of PA, LLC,* No. 08-4294, 2009 WL 10737282, at *3

(E.D. Pa. Feb. 3, 2009) (finding the gist-of-the-action doctrine did not bar the plaintiff's

tortious interference claim to the extent that it was based on actions the defendant took

to discredit and harm the reputation of the plaintiff); *N. Carolina Mut. Life Ins. Co. v.*

*Plymouth Mut. Life Ins. Co.*, 266 F. Supp. 231, 234 (E.D. Pa. 1967) ("holding the gist of

the action doctrine does not bar a tortious interference claim where the claim is based on a "purely malevolent" underlying motive or "a desire to do harm to the plaintiff for its own sake").

Defendants also contend they are entitled to summary judgment on the tortious interference claims because their actions were "privileged or justified" as their "contacts with referral sources and boomerang customers were proper and legal at all times." (Defs.' Br. at 23 n.2.)  For the reasons already stated, these are questions for the jury. Further, to the extent that the tortious interference claims rest on John Neison's recommendations and references for Jill Neison or Unhoch, questions remain with respect to whether John intended to harm D&A's relationship with them and whether his conduct was improper.  *See Acumed LLC v. Advanced Surgical Servs., Inc.,* 561 F.3d 199, 212 (3d Cir. 2009) (citing the elements of claims for tortious interference with existing or prospective business relationships).

3

Defendants also contend that the gist of the action doctrine bars D&A's breach of fiduciary duty claim against John Neison because D&A's allegations "mirror the allegations in its breach of contract claim."[6]  (Defs.' Supplemental Br. at 5.)  The doctrine bars a breach of fiduciary duty claim if there "are no allegations of breach of

---

[6]      The Court's declines to grant summary judgment in John Neison's favor based on the argument that he was not D&A's "fiduciary."  (*See* Defs.' Mot. at 24-25.)  "A fiduciary duty includes both a duty of loyalty – conducting the employer's business in the employer's best interest instead of one's own – and a duty of care – conducting the employer's business attentively and responsibly." *Colgate-Palmolive Co. v. Tandem Indus.*, 485 F. App'x 516, 518 (3d Cir. 2012) (citing *Sylvester v. Beck*, 178 A.2d 755, 757 (Pa. 1962).  Courts variously refer to claims such as the one D&A makes here as claims for a breach of the duty of loyalty or a breach of the fiduciary duty of loyalty.  *See, e.g.*, *AutoTrakk, LLC v. Auto. Leasing Specialists, Inc.*, No. 16- 01981, 2017 WL 2936730, at *9 (M.D. Pa. July 10, 2017) (describing the plaintiff's claim as one for a "breach of fiduciary duty of loyalty"); *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa. Super. Ct. 2003) (same).

fiduciary duty or duty of loyalty that transcend or exist outside of the parties' contractual agreements." *Certainteed Ceilings Corp. v. Aiken*, No. 14-3925, 2015 WL 410029, at *8 (E.D. Pa. Jan. 29, 2015) (citation omitted).  If the "fiduciary duty at issue goes 'beyond the particular obligations contained in' the parties' contract," the claim is not barred.  *DePuy Synthes Sales*, 259 F. Supp. 3d at 238 (quoting *Bohler-Uddeholm*, 247 F.3d at 105.  In its supplemental brief, D&A argues John Neison owed it a duty which was an obligation "not defined by the terms of [an employment contract] but rather by larger social policies embodied in the law of torts."  (Pl.'s Supplemental Br. at 4 (citing *PNC Mortg. v. Superior Mortg. Corp.*, No. 09-5084, 2012 WL 628000, at *26 (E.D. Pa. Feb. 27, 2012) (further citations omitted).)  It contends John's wrongful actions "go beyond a simple violation of his" obligations under the non-interference provision in his contract, arguing that he "disparaged" D&A while he was still its employee in breach of his duty of loyalty.  (Pl.'s Supplemental Br. at 7.)

In Pennsylvania, an employee owes the employer a duty

> to refrain from competing with the principal and from taking action on behalf of, or otherwise assisting, the principal's competitors throughout the duration of the agency relationship, as well as a duty not to use property or confidential information of the principal for the agent's own purpose or those of a third party.

*Synthes*, 25 F. Supp. 3d at 667 (E.D. Pa. 2014) (citing Restatement (3d) of Agency §§ 8.04, 8.05 (2006)).  Defendants believe that John Neison owed D&A no such duty.  But as D&A's employee, he owed it a duty to "not act[ ] for a person or entity whose interests conflict[ ] with" those of D&A.  *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa. Super. Ct. 2003); s*ee also Synthes*, 25 F. Supp. 3d at 667.  While this is a closer call, genuine issues of material fact remain with respect to whether any of Neison's conduct,

including his communications with October Three about Jill Neison and Unhoch, breached his obligations to D&A that exceeded any contractual obligations imposed by his non-interference provision. *Cf. AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC,* 199 A.3d 904, 915 (Pa. Super. Ct. 2018) (finding the defendant breached his duty of loyalty to the defendant by helping other employees breach their own noncompetition covenants by leaving the defendant to work for a competitor).

G

Finally, Defendants are not entitled summary judgment on D&A's unjust enrichment claim. "The equitable doctrine of unjust enrichment sounds in quasi-contract – a contract implied in law." *Integrated Waste Sols., Inc. v. Goverdhanam*, No. 10-2155, 2010 WL 4910176, at *15 (E.D. Pa. Nov. 30, 2010) (citing *Sevast v. Kakouras*, 915 A.2d 1147, 1153 n. 7 (Pa. 2007)). The gist of the action doctrine does not bar D&A's unjust enrichment claim because the doctrine "does not apply to causes of action based upon implied or constructive contracts." *Integrated Waste*, 2010 WL 4910176, at *15 (citation omitted). Although the claim may proceed to trial, D&A will not be permitted to recover under a theory of unjust enrichment for conduct that is shown to be governed by a valid contract. *See Gen3 Mktg. LEP v. Ella Paradis, Inc.*, No. 19-3498, 2020 WL 247528, at *3 (E.D. Pa. Jan. 15, 2020) ("Because an unjust enrichment claim is a "quasi-contract" claim, a party cannot recover on this claim when there is a valid contract") (citing *Ne. Fence & Iron Works, Inc. v. Murphy Quigley Co.*, 933 A.2d 664, 669 (Pa. Super. Ct. 2007)); *see also Wilson Area Sch. Dist. v. Skepton,* 895 A.2d 1250, 1254 (Pa. 2006) ("[T]he doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract . . . .").

An appropriate Order follows.

BY THE COURT:


 */s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.